# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**THOMAS T. TUNSTALL, V**                                   **CIVIL ACTION**

**VERSUS**                                                  **NO. 20-2773-JVM**

**HOPE DAIGLE, f/k/a HOPE D. THERIOT**

## <u>ORDER AND REASONS</u>

Plaintiff, Thomas T. Tunstall, V, filed this *pro se* federal civil action against Hope Daigle pursuant to 42 U.S.C. § 1983.  He claimed that his rights were violated by actions taken by Daigle in her role as an employee of the Louisiana Department of Family and Children Services ("LDFCS").  Specifically, he made the following allegations in his complaint:

In 2008, an Alabama state court terminated plaintiff's court-ordered obligation to pay child support.  Nevertheless, two "Alabama state agents" thereafter altered records to make it falsely appear as though he owed a substantial amount of child support and forwarded same, along with other false documentation, to Daigle.  On or about November 8, 2008, she then began publishing "known false and defamatory information" indicating that plaintiff was a "Dead Beat Dad" who owed more than $150,000 in child support.  Further, on or about November 20, 2008, she, acting in concert with the Terrebonne Parish District Attorney, had a petition filed in Louisiana state court concerning that alleged arrearage.  Without plaintiff being given notice and an opportunity to be heard on the matter, the Louisiana court granted an "*ex parte* income assignment and withholding orders."  However, in 2010, after he established that his children were adults and that no arrearage in fact existed, the court ordered that both the petition and the income assignment and withholding orders be "DISMISSED … in their entirety."  The state of Louisiana was notified of that dismissal, and the Louisiana child support case was closed.

But things did not end there.  Rather, in 2011, Kimberly Glidewell, the mother of plaintiff's children, then "fraudulently procured a Default Judgment against Plaintiff for $171,171.17." Based on that judgment, Daigle thereafter "falsified official government records" and utilized same to "again fraudulently procure *ex parte* income assignment orders" from the Louisiana state court, which she then used to "propound payroll garnishments upon Plaintiff's employer and begin the process to seize Plaintiff's state and federal income tax returns."  However, after LDFCS was sent a copy of the 2010 Louisiana state court judgment and advised that no wages would be withheld, plaintiff once again "concluded the matter had been resolved."

It was not.  Instead, in 2013, Daigle then "procured the suspension of Plaintiff's licenses and passport privileges."  In addition, while once again acting in concert with the Terrebonne Parish District Attorney, she pursued a "Rule for Contempt" against plaintiff in the Louisiana state court.

In February of 2014, several events then occurred.  First, when plaintiff attempted to renew his driver's license, he learned of the suspension procured by Daigle.  Second, when he was "notified by Capital One Bank that [his] company's loan application was **DENIED** based solely on the negative information [Daigle] had been reporting to various credit reporting agencies," he learned of her publication of the "known false and defamatory information" regarding the purported child support arrearages.  Third, due to the suspension of his licenses, he "was forced to cease working as an Admiralty Expert resulting in the continuous loss of approximately $30,000.00 in annual salary."  Fourth, he was served with the contempt action.

In March of 2014, as result of his inability to obtain funding necessary to meet his contractual obligations, plaintiff "was legally divested of all ownership of M & T Oceanographic Research, a closely held private LLC, resulting in the loss of approximately $1,350,000.00 in

assets, approximately $4,050,00.00 [sic] of the company's value and approximately $50,000.00 in annual draws and other benefits."

Thereafter, during a hearing on April 3, 2014, plaintiff first learned of the Glidewell 2011 default judgment.  Moreover, at that hearing, the hearing officer, based on Daigle's "knowing and willful misrepresentations," recommended that "the Louisiana court adjudge Plaintiff guilty as charged and sentence [him] to 30 days confinement (suspended upon paying $7500.00) and probation for a **DEFINITIVE** period of 2 years."  On June 12, 2015, the Louisiana state court followed the hearing officer's recommendation and held him in contempt.

On or about June 13, 2017, Daigle then notified plaintiff that the case she instigated against him had been closed; nonetheless, she still "refused to issue the statutorily mandated compliance release certificates, effectively maintaining the unlawful suspension of Plaintiff's licenses and passport privileges."

On July 6, 2017, the Louisiana state court then finally vacated all orders against plaintiff concerning the contempt and "DISMISSED the case in its entirety."  Moreover, on February 5, 2018, the Louisiana court further "entered an order in the criminal contempt action finding: Plaintiff owed zero dollars in child support; the State of Louisiana was required to reinstate all Plaintiff's licenses; and the court lacked jurisdiction or authority to order the U.S. Department of State reinstate Plaintiff's passport privileges."

According to plaintiff, despite those 2017 and 2018 court orders, Daigle still refused to issue the compliance release certificates necessary to negate the suspension of plaintiff's licenses. Ultimately, however, her supervisor executed the release certificates, and his licenses were reinstated on February 7, 2019.  Although his licenses have now been reinstated, he alleges that

Daigle still refuses "to take any action to return Plaintiff's property unlawfully seized between September 8, 2012 – July 6, 2017."

In his complaint, plaintiff included the following prayer for relief:

A.      Declare Daigle's continued deprivation of Plaintiff's possessory interest in his unlawfully seized property is violative of the 14th Amendment, U.S. Constitution and Article 1, §§2 and 3 Louisiana Constitution;

B.      Enter a permanent injunction compelling Daigle, and those persons in active concert or participation with her, to take any and all actions necessary to return all of Plaintiff's property seized between September 8, 2012 – July 6, 2017;

C.      Enter judgment against Daigle in her individual capacity for:   (1) a minimum of $2,226,928.84 in actual damages; (2) a minimum of $2,226,928.84 in compensatory damages; (3)  a minimum of $6,680,786.52 in punitive damages; (4) prejudgment interest; and

D.      Grant Plaintiff such other and further relief this Court deems just and proper.[1]

Daigle filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.[2]  Plaintiff opposed that motion.[3]  The parties consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).[4]

## I.  Rule 12(b)(1)

Rule 12(b)(1) governs challenges to a federal district court's subject-matter jurisdiction. The United States Fifth Circuit Court of Appeals has explained:

Federal courts are courts of limited jurisdiction; without jurisdiction conferred by statute, they lack the power to adjudicate claims.  Under Rule 12(b)(1), a claim is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the claim.  The court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.

---

[1] Rec. Doc. 1, pp. 14 and 15.
[2] Rec. Doc. 10.
[3] Rec. Doc. 11.
[4] Rec. Doc. 18.

*In re* FEMA Trailer Formaldehyde Products Liability Litigation (Mississippi Plaintiffs), 668 F.3d 281, 286 (5th Cir. 2012) (citations and quotation marks omitted).  "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction.  Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist."  Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001) (citations omitted).

One of the limitations on federal judicial authority is found in the Eleventh Amendment, which states:  "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  Regarding the Eleventh Amendment, the United States Supreme Court a century ago held:

> That a State may not be sued without its consent is a fundamental rule of jurisprudence having so important a bearing upon the construction of the Constitution of the United States that it has become established by repeated decisions of this court that the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given:  not one brought by citizens of another State, or by citizens or subjects of a foreign State, because of the Eleventh Amendment; and not even one brought by its own citizens, because of the fundamental rule of which the Amendment is but an exemplification.

*In re* State of New York, 256 U.S. 490, 497 (1921).  That "limitation deprives federal courts of any jurisdiction to entertain such claims, and thus may be raised at any point in a proceeding." Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99 n.8 (1984); accord Sissom v. University of Texas High School, 927 F.3d 343, 347 (5th Cir. 2019) ("[T]he Eleventh Amendment textually divests federal courts of jurisdiction over states …").  Therefore, "[w]hen the Eleventh Amendment applies, [federal] courts lack subject-matter jurisdiction over the claim."  Bryant v. Texas Department of Aging & Disability Services, 781 F.3d 764, 769 (5th Cir. 2015).

Moreover, that jurisdictional bar applies "regardless of the nature of the relief sought." Pennhurst, 465 U.S. at 100; accord Guajardo v. State Bar of Texas, 803 F. App'x 750, 754 (5th Cir. 2020) (noting that the Eleventh Amendment provides "immunity from private suit – including for money damages, injunctive relief, and declaratory relief"). And, important for the purposes of the instant case, Eleventh Amendment immunity extends not only to the states themselves, but also to state officials sued in their official capacities. Pennhurst, 465 U.S. at 101-02 ("The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest. Thus, the general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter. And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." (footnote, citations, quotation marks, and brackets omitted)).

## A. Official-Capacity Claims for Monetary Damages

Because Daigle is a state official, she argues that this Court lacks subject-matter jurisdiction over any claims for monetary damages asserted against her in her official capacity. True enough. Chaney v. Louisiana Work Force Commission, 560 F. App'x 417, 418 (5th Cir. 2014) ("[A] suit against a state official in [her] official capacity for monetary damages is treated as a suit against the state and is therefore barred by the Eleventh Amendment."). But the flaw in her argument is that plaintiff does **not** expressly assert any claims for monetary damages against her in her **official** capacity; he asserts such claims against her only in her **individual** capacity.[5] The Eleventh Amendment has no bearing on such claims. "Officers sued in their personal capacity come to court as individuals, and the real party in interest is the individual, not the sovereign."

---

[5] Rec. Doc. 1, p. 15.

Lewis v. Clarke, 137 S. Ct. 1285, 1291 (2017) (citation, quotation marks, and brackets omitted). "Where the power of government is abused by officeholders, … monetary recovery from the responsible individuals serves as an important mechanism to vindicate constitutional guarantees." Stem v. Ahearn, 908 F.2d 1, 5 (5th Cir. 1990). Therefore, "sovereign immunity does not erect a barrier against suits to impose individual and personal liability." Lewis, 137 S. Ct. at 1291 (quotation marks omitted).

Accordingly, this Court has subject-matter jurisdiction over plaintiff's claims for monetary damages asserted against Daigle in her individual capacity, and so those claims must be considered *infra* under Rule 12(b)(6).

### B.  Official-Capacity Claims for Declaratory and Injunctive Relief[6]

Daigle next argues that this Court lacks subject-matter jurisdiction over plaintiff's claims against her for declaratory and injunctive relief.  That argument is somewhat trickier due to an important limitation on the reach of the Eleventh Amendment:  "[T]he Eleventh Amendment **permits** suits for **prospective injunctive** relief against state officials acting in violation of federal law." Frew *ex rel.* Frew v. Hawkins, 540 U.S. 431, 437 (2004) (emphasis added); accord K.P. v. LeBlanc, 729 F.3d 427, 439 (5th Cir. 2013) ("A suit is not 'against' a state … when it seeks prospective, injunctive relief from a state actor, in her official capacity, based on an alleged ongoing violation of the federal constitution.  That principle, the Ex Parte Young rule, is based on the legal fiction that a sovereign state cannot authorize an agent to act unconstitutionally." (footnote, quotation marks, and brackets omitted)).  However, Daigle argues that the foregoing limitation is inapplicable here because, despite how plaintiff has couched his prayer for relief, the relief he is seeking is actually **monetary** in nature.  That argument is persuasive.

---

[6] The claims for declaratory and injunctive relief are asserted against Daigle in her official capacity.  See id. p. 11.

Eleventh Amendment immunity turns on the true nature of the relief sought.  Therefore, when a plaintiff is truly after **money** from a state official, the way his prayer for relief is phrased is not determinative.  <u>See, e.g.</u>, <u>Edelman v. Jordan</u>, 415 U.S. 651, 666 (1974) ("We do not read <u>Ex parte Young</u> or subsequent holdings of this Court to indicate that any form of relief may be awarded against a state officer, no matter how closely it may in practice resemble a money judgment payable out of the state treasury, so long as the relief may be labeled 'equitable' in nature."); <u>see also</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 278 (1986) ("Relief that in essence serves to compensate a party injured in the past by an action of a state official in his official capacity that was illegal under federal law is barred even when the state official is the named defendant.  This is true if the relief is expressly denominated as damages.  **It is also true if the relief is tantamount to an award of damages for a past violation of federal law, even though styled as something else**." (emphasis added; footnote and citation omitted)); <u>Fontenot v. McCraw</u>, 777 F.3d 741, 754 (5th Cir. 2015).

In the instant case, plaintiff requests that the Court "**[d]eclare** Daigle's continued deprivation of Plaintiff's possessory interest in his unlawfully seized property is violative of the 14th Amendment, U.S. Constitution and Article 1, §§2 and 3 Louisiana Constitution" and "**[e]nter a permanent injunction** compelling Daigle, and those persons in active concert or participation with her, to take any and all actions necessary to return all of Plaintiff's property seized between September 8, 2012 – July 6, 2017."[7]  However, Daigle notes, and plaintiff does not dispute, that the only "property" of his which has not already been returned are seized **wages**.  And there's the rub.

---

[7] <u>Id.</u> at pp. 14-15 (emphasis added).

8

The wages that were seized from plaintiff during that period do not exist as an identifiable piece of property.  Rather, those wages were fungible and, presumably, are now sitting in a government treasury commingled with other monies.  Therefore, any order "declaring" their seizure wrongful and "enjoining" the state (through Daigle) from continuing to retain them is tantamount an order that the state make plaintiff whole **by paying him an equivalent amount of money**.  That simply would not be prospective equitable relief to halt a continuing wrong; it would be monetary damages paid by the state for past wrongful conduct.  As a result, the Eleventh Amendment precludes this federal court from granting such relief, regardless of how the prayer for relief is phrased.  See, e.g., Zynda v. Arwood, 175 F. Supp. 3d 791, 801 (E.D. Mich. 2016) ("[Plaintiffs] request that the court '[o]rder defendants to return any state or federal tax return or wages garnished or intercepted' by the state.  Relief styled as such an 'order to return' money is not 'prospective.'  It compensates Plaintiffs for a past wrong, and the amount owed would be 'measured in terms of monetary loss resulting from past breach of a legal duty on the part of defendant officials.'  See Edelman, 415 U.S. at 668.  This claim for relief is barred by the Eleventh Amendment." (citation omitted)).

Accordingly, the Rule 12(b)(1) motion is **GRANTED** as to the claims for declaratory and injunctive relief, and those claims are **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.

## II.  Rule 12(b)(6)

As noted, Daigle alternatively requests dismissal pursuant to Rule 12(b)(6).  Therefore, plaintiff's remaining claims against her in her individual capacity for monetary damages must now be considered under that rule.

Rule 12(b)(6) allows a defendant to move for dismissal when a plaintiff fails to state a claim upon which relief can be granted.  In ruling on such a motion, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  _In re_ Katrina Canal Breaches Litigation, 495 F.3d 191, 205 (5th Cir. 2007) (quotation marks omitted).

Here, Daigle argues that plaintiff's remaining claims are prescribed.  "With respect to the statute of limitations defense, dismissal at the 12(b)(6) stage is proper only where it is evident from the complaint that the action is barred and the complaint fails to raise some basis for tolling."  Academy of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc., 998 F.3d 190, 200 (5th Cir. 2021) (quotation marks and brackets omitted).

In an action, such as this one, brought pursuant to 42 U.S.C. § 1983, the applicable statute of limitations is determined by reference to **state** law.   Harris v. Hegmann, 198 F.3d 153, 156-57 (5th Cir. 1999) ("Federal courts borrow state statutes of limitations to govern claims brought under section 1983. … [S]tate law supplies the applicable limitations period and tolling provisions." (citations omitted)); see also Bourdais v. New Orleans City, 485 F.3d 294, 298 (5th Cir. 2007) ("In § 1983 claims, the applicable statute of limitations is that which the state would apply in an analogous action in its courts.").  Therefore, "[t]he statute of limitations for Section 1983 claims is the forum state's personal-injury limitations period, which in Louisiana is one year."  Smith v. Regional Transit Authority, 827 F.3d 412, 421 (5th Cir. 2016).

On the other hand, "[w]hen a cause of action under § 1983 accrues is a question of **federal** law:  the accrual date of a § 1983 cause of action is a question of federal law that is _not_ resolved by reference to state law."  Bradley v. Sheriff's Department St. Landry Parish, 958 F.3d 387, 391 (5th Cir. 2020) (boldface emphasis added; quotation marks omitted).  On that point, the United States Fifth Circuit Court of Appeals has explained:

>Under federal law, the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.   A plaintiff's awareness encompasses two elements:  (1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions.   A plaintiff need not realize that a legal cause of action exists; a plaintiff need only know the facts that would support a claim.  Moreover, a plaintiff need not have actual knowledge if the circumstances would lead a reasonable person to investigate further.

Piotrowski v. City of Houston, 51 F.3d 512, 516 (5th Cir. 1995) (footnotes, citations, quotation marks, and brackets omitted).

This is the point at which this case gets particularly complicated.  Plaintiff denominates his individual-capacity claims against Daigle in the complaint as Claims II and III.[8]  However, those claims are overlapping (in that they are seemingly based on some or all of the same events) and not clearly differentiated.   But, in essence, there appear to be two distinct categories of claims, namely one category concerning his **property** (i.e. that his property was wrongly seized) and another category concerning his **person** (i.e. that he was wrongly charged with criminal contempt). For the following reasons, different limitations periods apply to those two categories of claims, and, therefore, the claims must be addressed separately.

### A. The "Property" Claim(s)

By plaintiff's own admission, the seizure of his property was effected between September 8, 2012, and July 6, 2017.  At the latest, plaintiff knew of the existence of that injury and Daigle's purported role in causing it on **July 6, 2017**.  Seemingly, therefore, that is the latest point at which the property claim(s) could have accrued.  If so, that presents plaintiff with a problem: This lawsuit was not filed within one year of that date – in fact, it was not filed until **October 7, 2020**, several years past the deadline.

---

[8] Id. at pp. 12-14.

In an attempt to overcome that problem, plaintiff argues that his prescriptive period was interrupted and/or tolled.  But, as is explained below, it was not.

### 1.  The "Interruption" Argument

Plaintiff argues that he interrupted the limitations period by naming Daigle as a defendant in an amended complaint he filed in a federal court in Alabama on November 16, 2018.[9]  He opines:  "The interruption of prescription ended and the prescription period started anew again on September 30, 2020, when Chief District Judge Dubose [sic] dismissed Daigle as a defendant [from the Alabama lawsuit] for lack of personal jurisdiction."[10]

Prescription can indeed be interrupted by the filing of a different lawsuit.  The United States Fifth Circuit Court of Appeals has explained:

> Pursuant to Louisiana Civil Code Article 3462, prescription is interrupted when the plaintiff files suit within the prescriptive period "in a court of competent jurisdiction and venue."  However, if the "action is commenced in an incompetent court, or in an improper venue, prescription is interrupted only as to a defendant served by process within the prescriptive period."  La. Civ. Code Ann. art. 3462 (2011); see also Doe v. Delta Women's Clinic of Baton Rouge, 37 So.3d 1076, 1079 (La.App. 1 Cir. 2010).

Carner v. Louisiana Health Service & Indemnity Co., 442 F. App'x 957, 959 (5th Cir. 2011).

However, that rule does not aid plaintiff in this case.  The Alabama federal court was not "a court of competent jurisdiction and venue" with respect to claims against Daigle; that is why that court ultimately dismissed those claims.  And, while a lawsuit filed in an incompetent court can still interrupt prescription, it does so **only if** the defendant was **served within the prescriptive period**.  That obviously did not occur here –plaintiff did not attempt to file the amended complaint adding Daigle as defendant in that lawsuit until November 16, 2018,[11] and service was not

---

[9] Rec. Doc. 11, pp. 8-9.
[10] Id. at p. 9 (footnote omitted).  Chief Judge DuBose did in fact dismiss the claims against Daigle on that basis on that date.  Tunstall v. Glidewell, Civ. Action No. 18-0356, 2020 WL 5816963, at *7 (S.D. Ala. Sept. 30, 2020).
[11] See Rec. Doc. 11, p. 8.

perfected on her until October 3, 2019.[12]  ***Both*** of those dates are well over one year past the latest possible accrual date of the property claim(s) (July 6, 2017).

In an attempt to avoid that complication, plaintiff advances yet another argument.  Citing Manuel v. City of Joliet, 903 F.3d 667 (7th Cir. 2018), he invokes what is sometimes referred to as the "continuing wrong" theory.[13]  Regarding that theory, the court in Manuel explained:  "When a wrong is ongoing rather than discrete, the period of limitations does not commence until the wrong ends."  Id. at 669.  Pointing to that language, he opines that his property claim(s) did not accrue until at least **February 1, 2019**, the date on which Daigle's supervisors "executed compliance release certificates" which finally "brought to an end, in part, Daigle's ongoing violations of Plaintiff [sic] constitutional rights to due process and equal protection of laws that occurred each and every day she effectively maintained the unlawful suspension of Plaintiff's licenses by refusing to issue the statutorily mandated compliance release certificates."[14]  He argues that because Daigle was served in the Alabama lawsuit within one year of **that date**, his prescriptive period was interrupted despite the fact that the Alabama federal court was not "a court of competent jurisdiction and venue" with respect to claims against Daigle.

Alas, no.  Even if the "continuing wrong" theory might sometimes be applicable, it is not in this case.  As the Seventh Circuit has explained:

> The theory … is not suited to cases … where the harm is definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress.  The exception as to continuing, ongoing acts does not apply where the alleged tortious acts caused direct damages that occurred at a certain point in time – resulting in immediate and direct injury with consequential effects.

---

[12] Id.
[13] Id.
[14] Id. at p. 8 & n.50.

Wilson v. Giesen, 956 F.2d 738, 743 (7th Cir. 1992) (quotation marks and ellipses omitted). Here, the alleged "wrongs" were the actions Daigle took to seize plaintiff's property, and those actions ceased no later than July 6, 2017. Although the harm occasioned by those wrongs was not remedied until much later, that is immaterial. As even the court in Manuel cautioned: "Notice that we speak of a continuing *wrong*, not of continuing *harm*; once the wrong ends, the claim accrues even if that wrong has caused a lingering injury." Manuel, 903 F.3d at 679; accord Earle v. District of Columbia, 707 F.3d 299, 306 (D.C. Cir. 2012) ("[T]he mere failure to right a wrong cannot be a continuing wrong for that is the purpose of any lawsuit and the exception would obliterate the rule." (quotation marks and ellipses omitted)); Mata v. Anderson, 635 F.3d 1250, 1253 (10th Cir. 2011) ("[T]he doctrine is triggered by continual unlawful acts, not by continual ill effects from the original violation.").

Accordingly, because plaintiff's property claim(s) would not qualify as a "continuing wrong," they accrued no later than July 6, 2017, the last date on which Daigle took any action to seize plaintiff's property, and the one-year limitations period then expired no later than July of 2018. As a result, when plaintiff moved to add Daigle as a defendant in the Alabama lawsuit in November of 2018, the limitations period **had already expired**. Therefore, at that point, there was simply nothing left to "interrupt."

### 2.  The "Tolling" Argument

### a.  *Contra non valentem*

"In applying the forum state's statute of limitations, the federal court should also give effect to any applicable tolling provisions." Gartrell v. Gaylor, 981 F.2d 254, 257 (5th Cir. 1993). Here, plaintiff argues that his limitations period was tolled under Louisiana's rule of *contra non valentem*. It was not.

14

The United States Fifth Circuit Court of Appeals has observed:

> Louisiana's general rule for tolling is referred to as *contra non valentem*, under which a prescription is tolled or suspended when a plaintiff is effectually prevented from enforcing his rights for reasons external to his own will. *Contra non valentem* prevents the running of the prescriptive period in four situations:
>
> > **(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;**
> > (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting;
> > (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or
> > (4) where the cause of action is neither known nor reasonably knowable by the plaintiff even though the plaintiff's ignorance is not induced by the defendant.

Bradley v. Sheriff's Department St. Landry Parish, 958 F.3d 387, 394 (5th Cir. 2020) (boldface emphasis added; footnotes and quotation marks omitted).

Plaintiff argues his case falls within the first category.[15]  Specifically, he argues that the Rooker-Feldman doctrine and the Younger abstention rule effectively prevented him from pursuing his claims against Daigle in a federal lawsuit at an earlier point in time.  However, the parties have not adequately briefed whether such legal limitations affecting a claim's present cognizability are among the types of "causes" adequate to implicate the first category, and there is reason to believe they would not be.  The Louisiana Supreme Court has noted that the first *contra non valentem* category is "infrequently applicable in modern times."  Whitnell v. Menville, 540 So. 2d 304, 308 (La. 1989).  Indeed, the category is rarely litigated, and the few Louisiana state court cases addressing it appear to involve causes that made it **physically** impossible for a litigant to access the courts.  See Treadwell v. St. Tammany Parish Jail, Civ. Action No. 13-5889, 2014 WL 3702691, at *5 n.2 (E.D. La. July 24, 2014) ("The standard for application of the first category

---

[15] Id. at p. 10.

of *contra non valentem* appears fairly high.  The courts, essentially, have to have been actually

closed."), aff'd, 599 F. App'x 189 (5th Cir. 2015).  For example, one Louisiana court observed:

> The first category of contra non valentem has been held to encompass situations **in which the courts are closed due** to war or some natural disaster, such as a hurricane.  Frank L. Maraist and Thomas C. Galligan, LOUISIANA TORT LAW, § 10.04[2] (2004 ed.).  The first category of contra non valentem thus covers the "'law of catastrophes': war, flood, hurricane, epidemic, strike, profound illness, etc.  These cases can be seen as veritable applications of the concept of force majeure."  Benjamin West Janke and Francois-Xavier Licari, Contra Non Valentem in France and Louisiana: Revealing the Parenthood, Breaking A Myth, 71 La. L. Rev. 503, 516 (2011).

Felix v. Safeway Insurance Co., 183 So. 3d 627, 629 (La. App. 4th Cir. 2015) (emphasis added);

accord National Union Fire Insurance Co. v. Ward, 612 So. 2d 964, 968 (La. App. 2d Cir. 1993)

("As to the first category, the plaintiff cannot claim that it was prevented from bringing suit

because of some legal cause which prevented the courts from taking cognizance of or acting on

the plaintiff's claim.  A 'legal cause' **in this context** appears to refer to a situation such as **the**

**courts being closed** by wartime conditions, as noted in Quierry's Executor v. Faussier's

Executors, 4 Mart. (O.S.) 609 (1817)." (emphasis added)).  Similarly, the category has been found

to encompass times when a litigant was unable to file his suit because the court was closed for an

extended holiday break.  Saxon v. Fireman's Insurance Co., 224 So. 2d 560, 561 (La. App. 3d Cir.

1969) ("The prescriptive period is suspended when, due to the absence of the clerk of court or

other personnel authorized to receive suits for filing, the party is unable to file his pleadings on the

last day of the delay.  Smith v. Taylor, 10 Rob. 133 (1845); see also, Ayraud v. Babin's Heirs, 7

Mart, N.S., 471, 481 (1829).  The principle thus applied is summarized by the maxim, Contra non

valentem agere nulla currit praescripto (No prescription runs against a person unable to bring an

action)."); see also Labit v. Palm's Casino & Truck Stop Inc., 4 So. 3d 911 (La. App. 4th Cir.

2009).

Therefore, it is not at all clear that the first category of Louisiana's rule of *contra non valentem* would encompass legal restrictions which merely involve the **cognizability** of a plaintiff's underlying claims.  And the Court finds plaintiff's argument particularly uncompelling given that "*[c]ontra non valent[e]m* is an exceptional remedy" and "should be strictly construed." Ellender v. Goldking Production Co., 775 So. 2d 11, 17 (La. App. 1st Cir. 2000).  Nevertheless, the Court is given pause by the construction given *contra non valentem* by the United States Fifth Circuit Court of Appeals in Burge v. Parish of St. Tammany, 996 F.2d 786 (5th Cir. 1993).  Citing to the doctrine, the Fifth Circuit held that the rule tolled a federal limitations period while a prisoner exhausted his remedies in the Louisiana state courts, reasoning:

> Prescription runs against all persons unless an exception is established by legislation.  However, Louisiana's jurisprudence recognizes a limited exception to codified prescriptions:  *Contra non valentem agere nulla currit praescriptio*, *i.e.* prescription does not run against a party who is unable to bring an action.   There are four recognized situations where the doctrine of *contra non valentem* might apply to toll the prescriptive period:

>> (1) Where there was a legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where some condition coupled with the proceedings prevented the creditor from suing or acting; (3) where the debtor has done an act to prevent the creditor from using the cause of action; (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though he is not induced by the defendant.

> **It is the first situation, prevention by a legal impediment, that guides the resolution of the instant dispute.**
> **Burge could not have prosecuted his civil rights claim for damages against the Appellees until he exhausted available state habeas remedies.**  This was a legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action.  Because he could not have prosecuted the § 1983 and § 1985 claims until the state habeas proceedings were exhausted, Burge's June 1991 filing of his civil rights claims was not prescribed.

Id. at 788 (emphasis added; citations, quotation marks, and brackets omitted); accord Harris v. Hegmann, 198 F.3d 153, 156-59 (5th Cir. 1999).  Given that more expansive construction of *contra*

*non valentem* by the Fifth Circuit, this inferior Court, out of an abundance of caution, will simply assume for the purposes of this decision that the first category does potentially encompass such legal limitations affecting a claim's present cognizability.   Nevertheless, that assumption ultimately does not aid plaintiff – because neither the <u>Rooker-Feldman</u> doctrine nor the <u>Younger</u> abstention rule actually prevented him from seeking federal relief for the following reasons.

First, <u>Rooker-Feldman</u>:   The United States Supreme Court is vested with **exclusive** "jurisdiction over appeals from **final** state-court judgments."   <u>Lance v. Dennis</u>, 546 U.S. 459, 463 (2006) (emphasis added).   Therefore, "under what has come to be known as the <u>Rooker-Feldman</u> doctrine, lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments." <u>Id.</u>[16]   Moreover, although "the doctrine usually applies only when a plaintiff explicitly attacks the validity of a state court's judgment, … it can also apply if the plaintiff's federal claims are so inextricably intertwined with a state judgment that the federal court is in essence being called upon to review the state court decision."   <u>Illinois Central Railroad Co. v. Guy</u>, 682 F.3d 381, 390-91 (5th Cir. 2012) (quotation marks omitted).

Here, plaintiff opines that the <u>Rooker-Feldman</u> doctrine "barred [him] from **commencing** any action against Daigle (or the Alabama state agents) **until** all adverse state court orders and judgments had been set aside and pending state court actions dismissed."[17]   But that is inaccurate. Even if <u>Rooker-Feldman</u> might otherwise be applicable, which is an issue this Court need not and does not reach, plaintiff's contention that the doctrine applies when the state court proceedings are **ongoing** is simply incorrect.   The United States Supreme Court "has repeatedly held that the **pendency** of an action in the state court is no bar to proceedings concerning the same matter in the

---

[16] The <u>Rooker-Feldman</u> doctrine derives its name from two Supreme Court cases, <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413 (1923), and <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462 (1983).
[17] Rec. Doc. 11, pp. 10-11 (emphasis added).

Federal court having jurisdiction." Exxon Mobile Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 292 (2005) (emphasis added; quotation marks omitted).  And the Rooker-Feldman doctrine does not change that general rule.  Rather, again, "the Rooker-Feldman doctrine is a narrow jurisdictional bar" triggered only by a **final** state-court judgment – in other words, it is limited "to those cases in which a party suffered an adverse final judgment **rendered by a state's court of last resort**." Gross v. Dannatt, 736 F. App'x 493, 494 (5th Cir. 2018) (quotation marks omitted); accord Parker v. Lyons, 757 F.3d 701, 706 (7th Cir. 2014) ("Rooker-Feldman does not bar the claims of federal-court plaintiffs who … file a federal suit when a state-court appeal is pending."). Accordingly, "the Rooker-Feldman doctrine does not apply if, at the time the federal suit is filed, the state proceeding implicated was ongoing, even if on appeal." Anthony of the Family Baker v. Child Support Division, No. 3:19-cv-341, 2018 WL 4858743, at *5 (N.D. Tex. Sept. 18, 2018), adopted, 2018 WL 4854167 (N.D. Tex. Oct. 5, 2018).  Therefore, the Rooker-Feldman doctrine would not have prevented the federal courts or their officers from taking cognizance of or acting on a claim asserted by plaintiff against Daigle.

Second, Younger:  In Younger v. Harris, 401 U.S. 37 (1971), the United States Supreme Court "held that absent extraordinary circumstances federal courts should not enjoin pending state criminal prosecutions." New Orleans Public Service, Inc. v. Council of City of New Orleans, 491 U.S. 350, 364 (1989) (NOPSI). Subsequently, out of a "concern for comity and federalism," the Supreme Court then expanded Younger's protections beyond state criminal proceedings to certain state civil proceedings. Id. at 368; accord Sprint Communications, Inc. v. Jacobs, 571 U.S. 69, 72-73 (2013) ("This Court has extended Younger abstention to particular state civil proceedings that are akin to criminal prosecutions or that implicate a State's interest in enforcing the orders and judgments of its courts." (citations omitted)); Middlesex County Ethics Committee v. Garden State

Bar Association, 457 U.S. 423, 432 (1982) ("The policies underlying Younger are fully applicable to noncriminal judicial proceedings when important state interests are involved.").

Nevertheless, Younger abstention is neither automatic nor without limitation.  Rather, "even in the presence of parallel state proceedings, **abstention from the exercise of federal jurisdiction is the exception**, not the rule."  Sprint Communications, Inc., 571 U.S. at 81-82 (emphasis added; quotation marks omitted); see also NOPSI, 491 U.S. at 368 ("[O]nly **exceptional** circumstances justify a federal court's refusal to decide a case in deference to the States." (emphasis added)).  Therefore, as the United States Fifth Circuit Court of Appeals has explained:

> Although Younger has been expanded beyond the criminal context, abstention is not required in every case of parallel state-court proceedings.  Rather, as the Supreme Court recently clarified, it applies only to three exceptional categories of state proceedings:  ongoing criminal prosecutions, certain civil enforcement proceedings akin to criminal prosecutions, and pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.  If state proceedings fit into one of these categories, a court appropriately considers before invoking Younger whether there is (1) an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) provides an adequate opportunity to raise federal challenges.

Google, Inc. v. Hood, 822 F.3d 212, 222 (5th Cir. 2016) (footnotes, citations, quotation marks, brackets, and ellipses omitted).  Moreover, given the nature of plaintiff's allegations regarding the purported ongoing and pervasive wrongs he has allegedly suffered through the intentionally abusive and fraudulent actions of state authorities, it is also important to remember that "[d]espite the strong policy in favor of abstention, a federal court may nevertheless intervene in a state proceeding upon a showing of bad faith, harassment or any other unusual circumstance that would call for equitable relief."  Diamond "D" Construction Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002) (quotation marks omitted);[18] accord Nobby Lobby, Inc. v. City of Dallas, 970 F.2d 82,

---

[18] The McGowan court explained:

87-89 (5th Cir. 1992) (finding that "the district court did not err in declining to abstain under Younger" because "the contested seizures and arrests [at issue] were conducted in bad faith and with an intent to harass").

Therefore, the mere existence of the Younger abstention doctrine in no sense prevented plaintiff from commencing a federal lawsuit against Daigle in a timely manner.  He could have done so.  If he had, perhaps Daigle might have raised the doctrine in attempt to thwart his claim; however, even if she had done so, plaintiff's quiver was not empty, because, again, there are exceptions to Younger, and he was free argue that they applied and permitted his claims to proceed in federal court.  Such an argument might – or might not – have prevailed; but we have no way to know, because he did not even try.  Instead, he chose a perilous course of action: he merely assumed that any attempt would have been futile and simply hoped that a federal court in the future would agree and therefore excuse a filing he made after the limitations period had expired.   In hindsight, of course, that was clearly imprudent, but that fact is not sufficient to change the result herein.

For these reasons, the Court finds that neither the Rooker-Feldman doctrine nor the Younger abstention rule prevented plaintiff from seeking federal relief in a timely manner. Therefore, even if the first category of *contra non valentem* scenarios is properly extended to encompass **legal doctrines** which prevent the courts or their officers from taking cognizance of or

---

In a companion case to Younger, the Supreme Court expanded on Younger's conception of bad faith, explaining that abstention may be inappropriate in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction. As the application of Younger abstention evolved beyond the criminal realm, the language of the bad faith exception became more generic. So, now, for a federal plaintiff to invoke the bad faith exception, the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome.  Thus, for example, we have found that a refusal to abstain would be justified where a proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to harass.

McGowan, 282 F.3d at 198-99 (citations, quotation marks, and ellipsis omitted).

acting on a plaintiff's action, neither the <u>Rooker-Feldman</u> doctrine nor the <u>Younger</u> abstention would qualify under the facts of the instant case.

### b.  Other Basis for Equitable Tolling

Lastly, the Court notes that plaintiff also appears to make a broader bid for equitable tolling by arguing that any delays in serving Daigle in the Alabama lawsuit were simply not his fault. Specifically, he argues that (1) because the Alabama court had to first rule that he was allowed even to file the amended complaint naming Daigle as a defendant in that action, and (2) because that was a protracted process, all resulting delays in service were solely the court's fault, not his. That argument is a nonstarter.  In the first place, as already explained, any arguments premised on the Alabama lawsuit are a red herring – the limitations period for asserting the property claim(s) against Daigle had **already expired** before plaintiff even attempted to add her as a defendant in that action.  As such, even if plaintiff's delay in serving Daigle in the Alabama lawsuit were justified, it is of no consequence in **this** action.  In the second, again, plaintiff simply has not shown that he was required to pursue his claims against Daigle in the context of that lawsuit.[19]  Rather, he could have – and should have – filed a separate suit against Daigle in a court of competent jurisdiction and venue within the limitations period.

Even in cases where equitable tolling is recognized, it is available only when an "external obstacle" prevented a litigant from seeking federal relief in a timely fashion – and the mere fact that a litigant believed an otherwise required action would have been futile, uncertain, risky, or expensive does not qualify.  See <u>Menominee Indian Tribe of Wisconsin v. United States</u>, 577 U.S. 250, 255-58 (2016).  As explained exhaustively herein, there was no such external obstacle which

---

[19] And, obviously, he should not have done so, in that the Alabama court was not one of competent jurisdiction and venue with respect to any claims against Daigle.

prevented plaintiff from presenting his claims against Daigle to a federal court for consideration within the limitations period. Therefore, equitable tolling simply is not available.

**In summary:**   Plaintiff's property claim(s) against Daigle in her individual capacity accrued in July of 2017, and the limitations period expired one year later in July of 2018.  **That limitations period was neither interrupted nor tolled.**  As a result, when plaintiff filed this lawsuit on October 7, 2020, the prescriptive period for the claim(s) had already expired. Accordingly, as Daigle argues, the property claim(s) must be dismissed pursuant to Rule 12(b)(6).

## B.  The "Person" Claim(s)

Now, lastly, the Court addresses plaintiff's claim(s) that Daigle's actions led to him being wrongly charged with and convicted of criminal contempt.  He argues that because such claims were "predicated on Daigle's fabrication of evidence and use of known falsified official government records to initiate the criminal contempt action against Plaintiff,"[20] they did not accrue until his criminal contempt conviction was invalidated in **February of 2018**.[21]  But, again, even if the Court simply assumes for the purposes of this decision that he is correct on that point, dismissal is still necessary.  Under that scenario, he would have had to file this lawsuit by **February of 2019**. But, as noted, this lawsuit was not filed until **October 7, 2020**.  Again, too late.  Therefore, plaintiff's "person" claim(s) must likewise be dismissed unless the prescriptive period was either interrupted or tolled.  It was not.

Even if interruption would otherwise be available based on the Alabama lawsuit, plaintiff would have had to serve Daigle in that action in within one year of February of 2018 – and he

---

[20] Rec. Doc. 11, p. 7.
[21] Id. at pp. 7-8.

admits that she was not served until October of 2019.[22]  That was too late to result in an interruption.

Any argument based on *contra non valentem* or other equitable doctrine likewise fails because, again, nothing prevented plaintiff from filing a lawsuit against Daigle in a court of competent jurisdiction and venue within the limitations period.

For all of these reasons, it is apparent that the claims against Daigle in her individual capacity were prescribed at the time that this lawsuit was filed.  Therefore, the Court need not – and does not – address her alternative arguments advanced in support of her motion.

Accordingly,

**IT IS ORDERED** that Daigle's motion to dismiss, Rec. Doc. 10, is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's official-capacity claims against Daigle are **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.

**IT IS FURTHER ORDERED** that plaintiff's individual-capacity claims against Daigle are **DISMISSED WITH PREJUDICE** as prescribed.

New Orleans, Louisiana, this   10th   day of August, 2021.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[22] Rec. Doc. 11, p. 8.